UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| ROBERT DURANT | ) | 3:18-CV-00431 (KAD) |
| --- | --- | --- |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| YALE UNIVERSITY | ) | |
| *Defendant*. | ) | February 19, 2020 |

**MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 32)**

Kari A. Dooley, United States District Judge:

This case arises out of the employment relationship between Plaintiff-employee, Robert Durant ("Durant"), and Defendant-employer, Yale University ("Yale"). In his Amended Complaint, Durant, initially proceeding *pro se*,[1] alleges various discrimination-related claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII"), and the Connecticut Fair Employment Practices Act, CONN. GEN. STAT. §§ 46a-60(b)(1), 46a-60(b)(4) ("CFEPA"). Pending before the Court is Yale's motion for summary judgment, to which Durant has filed his opposition. For the reasons below, the motion for summary judgment is GRANTED.

**Background**

Durant, an African-American male, began working for Yale in 2002. For the relevant period, Durant has worked for the Yale Animal Resource Center ("YARC") as an Animal Tech IV (a.k.a., Animal Tech D) in Unit 2. As an Animal Tech IV, Durant's job responsibilities include animal husbandry, sanitation, and handling in various research laboratories along with other duties necessary for the safe and ethical treatment of research animals. From February 2013 through the

---

[1] Durant's counsel appeared on May 6, 2019. Durant has been represented by counsel throughout briefing and argument on the instant motion.

1

present, Melissa Bonk ("Bonk"), a YARC Manager, has been Durant's supervisor. While working under Bonk, Durant has received only one verbal warning[2] for allegedly failing to act professionally and raising his voice. Durant has not received any suspensions, written warnings, or other verbal warnings from Yale. He has held the same job title and his pay has not decreased.

However, Durant alleges that Yale engaged in race-based discrimination with respect to the terms and conditions of his employment. Throughout his tenure, Durant claims that Yale denied him overtime and various training opportunities while affording the same overtime and training opportunities to his Caucasian co-workers. More specifically, Durant alleges that Yale refused to train him for assignments in the "aquatics" and "mouse" rooms, which would have allowed Durant to receive more overtime. Durant also asserts that Yale assigned his Caucasian co-workers more desirable work, such as "Core Time" assignments, and made him work harder than his Caucasian co-workers. In his Amended Complaint, Durant alleges that Yale's discriminatory conduct consists of retaliation, "[e]motional distress, discrimination, disparate treatment, hostile work environment and harassment." ECF No. 29 at p. 4.

**Standard of Review**

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[2] Durant does not allege that this verbal warning was an "adverse employment action" giving rise to an inference of discriminatory intent.

Significantly, the inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary

judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

The Court first addresses Durant's abandonment of certain of his claims. Although Durant's Amended Complaint includes claims of retaliation and a hostile work environment, his opposition to the motion for summary judgment addressed only his discrimination claim. And at oral argument, Durant's counsel agreed that Durant was not pursuing either his retaliation or hostile work environment claims. Remaining are Durant's allegations that Yale discriminated against him insofar as (1) Yale unfairly limited Durant's overtime opportunities and (2) Durant's working conditions were inferior to those of his Caucasian co-workers.

**Discrimination Under Title VII and CFEPA**

Under Title VII and CFEPA,[3] a plaintiff alleging discrimination is subject to the familiar three-part burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). The *McDonnell Douglas* test proceeds as follows: (1) plaintiff "bears the minimal burden of setting out a *prima facie* discrimination case," (2) if plaintiff satisfies its burden, plaintiff "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action," and (3) if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption evaporates and the plaintiff must prove that the

---

[3] "CFEPA claims are analyzed in the same manner as those under Title VII." *Sample v. Wal-Mart Stores, Inc.*, 273 F. Supp. 2d 185, 189 (D. Conn. 2003), *aff'd*, 108 F. App'x 15 (2d Cir. 2004) (summary order), (citing *Brittell v. Department of Correction*, 247 Conn. 148, 164 (1998)).

4

employer's proffered reason was a pretext for discrimination." *Id*. (internal quotation marks and citations omitted).

To establish a *prima facie* discrimination case, plaintiff must show: (1) "he belonged to a protected class," (2) "he was qualified for the position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted). If a plaintiff does not have direct evidence of discriminatory intent, plaintiff may present evidence of disparate treatment, i.e., evidence that his employer treated him less favorably than similarly situated employees outside of his protected class, in order to support an inference of discriminatory intent. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89–90 (2d Cir. 2019) (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).

Here, Durant asserts that Yale discriminated against him in two ways—by consistently giving him "less desirable duties within his job category in comparison to his Caucasian compatriots" and by limiting his overtime opportunities through "racial selectivity in deciding which employees within his category would receive the sort of training he has requested that opens up added overtime opportunities." Pl. Opp'n. to Def. Mot. for Summ. J., ECF No. 38 at p. 3. In advancing these claims, Durant concedes that Bonk has "never made any oral or written comments—discriminatory or otherwise—about [Durant's] race or ethnicity." *See* Def. L. R. 56(a)(1) Statement ¶ 16; Pl. L. R. 56(a)(2) Statement ¶ 16. Thus, without direct evidence of discriminatory intent, Durant proceeds under a disparate treatment theory of discrimination. *See Bentley*, 935 F.3d at 89–90 (citing *Mandell*, 316 F.3d at 379).

By motion for summary judgment, Yale argues that Durant's claims fail because he has not and cannot establish the third, and by extension the fourth, requirements of a *prima facie* discrimination case, that he suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent. Specifically, Yale asserts that Durant's working conditions do not constitute an "adverse employment action" and Durant was not denied overtime opportunities compared to his Caucasian co-workers.

### *Working Conditions*

Yale asserts that it is entitled to summary judgment because a reasonable jury could not find that Durant's working conditions rise to the level of an "adverse employment action." In this regard, Durant advances claims as to both the quality and quantity of his work. He asserts that he was given less favorable assignments than his Caucasian co-workers and he asserts that he was given a heavier workload than his Caucasian co-workers.

"An adverse [employment] action is a 'materially adverse change' in the terms and conditions of employment." *Pouncey v. Town of Hamden*, No. 3:14-CV-00475 (JAM), 2017 WL 5757740, at *8 (D. Conn. Nov. 28, 2017) (citing *Sanders v. New York City Human Res. Admin.*, 361 F. 3d 749, 755 (2d Cir. 2004)). "To be adverse, the change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id*. (internal quotation marks omitted) (citing *Sanders*, 361 F. 3d at 755).

Unfavorable or difficult working conditions are not generally considered by courts to be adverse employment actions under Title VII. For example, in *George v. U.S. Postal Serv.*, in the

context of a retaliation claim,[4] plaintiffs, part-time mail handlers, complained that they (1) were denied lunch breaks and leave time, (2) had their days off changed and break time shortened, and (3) were "more frequently assigned to 'hard' work places with heavy workloads without assistance." No. 3:04CV1073 (PCD), 2006 WL 798924, at *10 (D. Conn. Mar. 28, 2006), *aff'd*, 266 F. App'x 49 (2d Cir. 2008). The court concluded that "[n]one of the employment actions cited by [plaintiffs] rise to the level of being 'adverse.'" *Id*. Particularly relevant here, with respect to the "heavy" or "hard" workloads, the court noted, "[p]laintiffs present no evidence to show that the 'heavy' or 'hard' duties assigned were unsuited to their skills or inconsistent with their positions." *Id*.

Similarly, in *Pouncey,* the court found that the unfavorable working conditions complained of by the plaintiff, a firefighter, did not constitute an adverse employment action. 2017 WL 5757740 at *9. There, the plaintiff complained that he suffered an adverse employment action when his employer intermittently assigned him to the "rider" position as opposed to the "driver" position when responding to calls. *Id*. at *4. According to the plaintiff, the "rider" position "is less prestigious and carries a negative connotation" and that "assigning one to drive position gives one opportunity to develop more skills and better opportunity for growth." *Id*. at *9 (internal quotation marks omitted). The court discounted the plaintiff's "vague" statements regarding the relative prestige of the driver position and the opportunities it presented especially in light of plaintiff's admission that the "duties of the driver do not impact the actual pay grade or check that the firefighter receives." *Id*. (internal quotation marks and brackets omitted). As a result, the court found that the plaintiff's less desirable work assignment was not an adverse employment action. *Id*.

---

[4] An "adverse employment action" is also an element of a retaliation claim under Title VII. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).

Less desirable work assignments and unfavorable working conditions may be classified as adverse employment actions when they reflect a materially adverse change in the terms and conditions of a plaintiff's employment. For example, in *Terry v. Ashcroft*, the court found that a reasonable trier-of-fact could conclude that an Immigration and Naturalization Service ("INS") Special Agent's allegations regarding his unfavorable working conditions were adverse employment actions. 336 F.3d 128, 140–47 (2d Cir. 2003). First, the court found that "a reasonable fact-finder could conclude that the suspension of [plaintiff's] firearms privileges constituted an adverse employment action" because a firearm may be "an essential tool for a Special Agent, and that the lack of one for a significant period of time could limit the types of assignments an Agent may take and, therefore, limit the development of the Agent's career." *Id*. at 142–43. Next, the court found that plaintiff presented sufficient evidence to show that his transfer within the INS may be an adverse employment action insofar as there was evidence that the transfer was actually intended as harassment and discipline. *Id*. 143–44. Lastly, the court found that a reasonable trier-of-fact could find that plaintiff's suspension from riding in government-owned vehicles "was a sufficiently adverse employment action where it would [(1)] require plaintiff to undertake an allegedly much more taxing commute than would otherwise have been possible" and (2) limit plaintiff's ability to "fully engage in his new position . . . ." *Id*. 144–45. Importantly, in each instance, the unfavorable working condition complained of by the plaintiff presented significant hurdles to his ability to perform his job. Therefore, the court found that a reasonable trier-of-fact may consider such conditions to be "adverse employment actions." *Id*. at 140–47.

Likewise, in *Feingold v. New York*, the court found that unfavorable working conditions consisting of "a disproportionately heavy workload" may be an "adverse employment action." 366 F.3d 138, 152–53 (2d Cir. 2004). There, plaintiff, an Administrative Law Judge ("ALJ") for the

New York Department of Motor Vehicles, alleged that "he was subjected to an excessive workload" insofar as he, and other white ALJs, "were assigned a heavier docket of cases as a result of discriminatory intent." *Id.* at 153. Specifically, plaintiff alleged that (1) the Acting Senior Judge "*regularly* reassigned cases to the white ALJs that had originally been allocated to the three African-American ALJs," and (2) the Chief Clerk "*regularly* reshuffled [assignments] to give white ALJs more work than their African-American counterparts." *Id.* (emphasis added). Thus, the court found that a trier-of-fact "could conclude that [plaintiff-ALJ] was subjected to disparate treatment under circumstances giving rise to an inference of racial discrimination." *Id.*

In support of his "working conditions" claim, Durant submits his own affidavit and various YARC documents listing daily tasks and assignments. Durant Aff. ¶¶ 6, 8–9, ECF No. 38-2; Durant Aff. Exs. 2, 5–6, ECF Nos. 38-4, 38-7, 38-8. In his affidavit, Durant opines that Yale (1) gave Core Time, "a desirable work assignment," to Caucasian co-workers instead of him, (2) denied him work breaks given to Caucasian co-workers, and (3) required him to do the same amount of work in the same amount of time as two of his Caucasian co-workers.[5] Durant Aff. ¶¶ 6, 8–9, ECF No. 38-2. To support these statements, Durant submits YARC employee "Daily Room Assignments" ("DRAs") from seven distinct dates during his multi-year tenure under Bonk's supervision. *See* Durant Aff. Exs. 2, 5–6, ECF Nos. 38-4, 38-7, 38-8.[6] The DRAs from March 25,

---

[5] Durant's affidavit is most accurately read as containing his opinions. By way of example, it would be all but impossible for Durant to competently testify regarding the extent to which his co-workers are given breaks, the length of those breaks and the level of exertion required by or put forth by his co-workers. Nor does his affidavit provide the evidentiary foundation for his conclusory assertions regarding perceived discriminatory practices. The Court accepts that the Plaintiff might perceive disparate treatment but looks to admissible evidence when deciding a motion for summary judgment.

[6] The DRAs are dated 3/25/16; 4/26/16; 6/9/16; 11/20/16; 3/12/17; 3/13/17; and 4/26/17. The documents are attached to Durant's Affidavit. They are not identified or authenticated, and their genesis is not otherwise explained. On their face, they appear incomplete. For example, many of the records include pagination which reflect that they are part of a larger document, i.e., "5 of 5," "2 of 5," when it is clear that the other pages to the document are not included. In addition, many of the documents contain handwritten notes of unknown origin but which certainly appear to be added to the records after their original creation. Finally, the DRAs reflect the work assignments of the Plaintiff and his co-workers by their first names. There is no basis to discern from the records either the race or ethnicity of the co-workers identified. Accordingly, the extent to which these documents can be relied upon at all is

2016 appear to allot breaktime to Durant's co-workers but not to Durant. Durant Aff. Ex. 5, ECF No. 38-7.[7] And at oral argument, Durant's counsel identified DRAs from a single day, April 26, 2016, on which Durant had sixty minutes allotted to wash the walls on the ninth-floor corridor while two of his co-workers were allotted sixty minutes to wash the walls on the eighth-floor corridor. Durant Aff. Ex. 6, ECF No. 38-8. From these records, Durant asserts a genuine issue of material fact as to whether his working conditions amounted to an adverse employment action or whether he was given a disproportionate workload giving rise to an inference of discriminatory intent.

Durant's working conditions do not constitute a material change in the terms and conditions of his employment. Durant merely complains about perceived inconveniences or inequities within the nature of his job and asserts vague opinions about less desirable work assignments. Similar to the plaintiffs in *George*, who complained that they were assigned heavy workloads and denied work breaks, Durant presents no evidence that his "dirty and laborious job assignments" were inconsistent with his position or outside the scope of his job responsibilities. *See* Durant Aff. ¶ 6, ECF 38-2; *see also* Bonk. Aff. Ex. B, ECF No. 36-2 (Animal Technician IV Job Description). Additionally, unlike the plaintiff in *Terry*, who complained that his transfer and other limitations negatively impacted his ability to do his job, Durant presents no evidence that his working conditions prevented him from doing his job. In fact, Durant submitted his 2016–2017 performance evaluation, which reflects that he was doing his job quite well. Durant Aff. Ex. 1, ECF No. 38-3. Also, like the plaintiff in *Pouncey*, who complained that his assignment as a "rider"

---

questionable. Notwithstanding, the Court assesses the Plaintiff's claims regarding the purported import of these records.
[7] However, the DRAs for April 26, 2016, November 20, 2016, and March 13, 2017, documents offered for a different purpose, reflect that Durant received the same allotted break time from Yale as his co-workers. *See* Durant Aff. Exs. 2, 6, ECF Nos. 38-4, 38-8.

was less prestigious than others, Durant presents no evidence that his failure to get more favorable "Core Time" resulted in an inferior job title or a decrease in pay. *See* Def. L. R. 56(a)(1) Statement ¶¶ 10–11; Pl. L. R. 56(a)(2) Statement ¶¶ 10–11 (admitting that Durant's job title has remained the same and his pay has not decreased under Bonk's supervision). Therefore, while a jury might conclude that Durant's working conditions are not as he prefers, it could not reasonably conclude that his working conditions rise to the level of an adverse employment action.

The same is true for Durant's allegation that Yale assigned him a disproportionately heavy workload. As discussed above, in *Feingold*, the court found that a reasonable jury could conclude that the terms and conditions of plaintiff's employment were materially altered by his supervisors' *regular* redistribution of work from African-American ALJs to him and other white ALJs. 366 F.3d at 152–53. Here, however, Durant points to only *one* example on *one* day in which he was assigned to clean the ninth-floor corridor in the same amount of time that two of his co-workers were assigned to clean the eighth-floor corridor. Durant Aff. Ex. 6, ECF No. 38-8. This singular example does not raise a genuine issue of material fact as to whether Durant's workload was disproportionate to that of his Caucasian co-workers so as to create an adverse employment action. To conclude otherwise would require the court (or a jury) to draw a string of inferences bereft of evidentiary support: (1) that cleaning the ninth-floor corridor required a similar amount of labor as cleaning the eighth-floor corridor; (2) that the co-workers assigned to the eighth-floor corridor were as capable as Durant; (3) that Yale made similar disproportionate work assignments on a regular basis; and (4) when Yale made those disproportionate work assignments they tended to favor Durant's Caucasian co-workers. While the Court must make all permissible factual inferences in favor of Durant for the purposes of this motion, for a jury to conclude that Durant

suffered from an adverse employment action based on one possibly disproportionate work assignment over the course of a six-year tenure would require impermissible speculation.

It would also require impermissible speculation for a jury to conclude that Durant suffered an adverse employment action based on the allegedly disproportionate break time allocated by Yale on March 25, 2016. Durant Aff. Ex. 5, ECF No. 38-7. Even assuming the DRAs for March 25, 2016 established unequal break time allotment on that day, this singular example does not raise a genuine issue of material fact as to whether Durant's actual break time was regularly or consistently deficient when compared to that of his Caucasian co-workers so as to create an adverse employment action. And as noted above, the DRAs from three different dates reflect that Durant was allotted the same break time as his co-workers. Speculation based on one day's potentially unfavorable break time allocation over the course of Durant's multi-year tenure does not raise a genuine issue of material fact on this issue.

### *Overtime Opportunities*

Although access to or a reduction in overtime may constitute an adverse employment action, *see*, *e.g.*, *Sinopoli v. Regula*, 125 F.3d 844 (2d Cir. 1997) (summary order), Yale asserts it is entitled to summary judgment because Durant failed to counter its conclusive evidence that Yale did not unfairly limit Durant's overtime opportunities compared to that of his Caucasian co-workers. In support of this argument, Yale submitted YARC overtime records for Animal Technicians under Bonk's supervision for 2014-2019. Bonk Aff. Ex. E, ECF No. 36-5. The records reflect that Durant was the highest overtime earner for every year except 2016, in which he was the second highest overtime earner. *Id*. Thus, Yale argues, these records conclusively establish that Yale did not unfairly limit Durant's overtime so as to demonstrate an "adverse employment action" as required to establish a *prime facie* case of discrimination.

In response, Durant provides other work records which he claims demonstrate, or at least raise a genuine issue of material fact, that (1) Caucasian co-workers received more overtime and (2) Yale gave overtime to Durant's Caucasian co-workers when Durant was not allowed to work a full shift. Durant Aff. ¶ 7, ECF No. 38-2. Durant submits overtime availability calendars from September 2016 and October 2016, Durant Aff. Ex. 3, ECF No. 38-5, and DRAs for November 29, 2016. Durant Aff. Ex. 4, ECF No. 38-6. These records, even if considered an accurate snapshot of the overtime scheduling for the few days, weeks or months they represent, do not alter the fact that Durant was the top overtime earner every year that he worked under Bonk's supervision save for 2016 when he was the second highest overtime earner. Indeed, Durant, aside from his own opinion to the contrary, offers no basis to challenge the accuracy of these statistics. As a result, Durant cannot and has not established a *prima facie* case of discrimination insofar as a reasonable jury could not find that he suffered from an "adverse employment action" related to his access to overtime opportunities.[8] *See Lockhart v. Hofstra Univ.*, 123 F. App'x 31, 32–33 (2d Cir. 2005) (summary order) (finding that plaintiff-employee failed to establish an adverse employment action after defendant-employer offered unrebutted evidence showing that plaintiff-employee worked more overtime hours than all but one of his co-workers).

In sum, there is no genuine issue of material fact as to whether Durant has established a *prima facie* case of discrimination under Title VII or CFEPA. He has not.

**Conclusion**

For the foregoing reasons, the Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment in favor of the Defendant and to close this matter.

---

[8] For the same reason, Durant's allegation that Yale unfairly limited his overtime by denying him training opportunities also fails.

**SO ORDERED** at Bridgeport, Connecticut, this 19th day of February 2020.

                                       */s/ Kari A. Dooley*
                                       KARI A. DOOLEY
                                       UNITED STATES DISTRICT JUDGE